IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HELEN VANHORN, | ) CIVIL NO. 12-00215 JMS-KSC |
| | ) |
| Plaintiff, | ) ORDER GRANTING IN PART AND |
| | ) DENYING IN PART |
| vs. | ) DEFENDANT'S MOTION FOR |
| | ) SUMMARY JUDGMENT |
| THE HANA GROUP, INC. d/b/a/ | ) |
| HANA SECURITY SERVICES, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Helen E. VanHorn ("Plaintiff"), a former security officer at Joint Base Pearl Harbor-Hickam ("Pearl Harbor" or "the base"), asserts claims against her employer, The Hana Group, Inc. d/b/a Hana Security Services ("Defendant"), for race and disability discrimination and failure to provide reasonable accommodations, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), and Hawaii Revised Statutes ("HRS") Chapter 378.

Currently before the court is Defendant's Motion for Summary Judgment ("Motion").  During the September 23, 2013 hearing, the court asked for clarification of the scope of Plaintiff's disability discrimination claims.  Plaintiff's counsel stated affirmatively that the time period for which Plaintiff is alleging that Defendant failed to provide a reasonable accommodation is from early November 2010 to December 15, 2010.  Accordingly, the court addresses only that time frame in connection with Plaintiff's disability discrimination claims.  For the following reasons, the Motion is GRANTED as to the Title VII and HRS § 378-2 racial discrimination claims and DENIED as to the ADA and HRS § 378-2 disability discrimination claims.

## II. <u>BACKGROUND</u>

**A.      Factual Background**

Plaintiff was employed by Defendant as a security officer from January 2008 until October 25, 2011.  Doc. No. 49, Def.'s Concise Statement of Facts ("CSF") ¶¶ 4, 35.[1]  During Plaintiff's employment, Defendant provided armed security guards to Pearl Harbor.  Doc. No. 49-1, Michael E. Rawlins Decl. ¶ 2.

---

[1]  Where a fact is not in dispute, the court cites directly to Defendant's CSF.

2

### 1.   *Failure to Accommodate*

Defendant's armed security guards were "responsible for controlling various access points to [the base]," and were "stationed at many different posts throughout the [base]," depending upon "the Navy's requirements and Defendant's staffing levels." *Id.* ¶ 5.  The "Armed Security Officer Job Description, applicable to all armed guards who worked at [Pearl Harbor]," described "the job duties, job requirements, physical requirements, and working conditions" for this position.  *Id.* ¶¶ 3-4; Doc. No. 49-2, Def.'s Ex. A.  Job requirements included passing annual weapons and training testing as well as an annual physical fitness assessment.  Doc. No. 49-2, Def.'s Ex. A; Doc. No. 49-13, Def.'s Ex. L.

During the application process, "Plaintiff was made aware of some of the essential job requirements and functions - including that the physical requirements included regularly standing/walking and rarely sitting."  Doc. No. 49, Def.'s CSF ¶ 3; Doc. No. 49-3, Def.'s Ex. B.  Defendant alleges that additional essential functions of the armed security officer job included:

> performing identification checks and vehicle inspections;
> meeting physical fitness and weapons qualifications set
> by the Navy; being properly outfitted with the required
> duty belt and its equipment and weaponry; rotating
> among posts in accordance with the Navy's and
> [Defendant's] needs; and to remain standing at post
> armed, equipped, and prepared to deal with emergency
> situations and potential threats to base security.

3

Doc. No. 49, Def.'s CSF ¶ 5; Rawlins Decl. ¶¶ 6, 9-11, 17-18, 20-23.

Plaintiff disputes Defendant's characterization of "regularly standing/walking and rarely sitting," or "remain standing at post" as essential job functions, alleging that "during the tenure of her employment with Defendant, [she] observed various armed security officers [employed by Defendant] perform functions, duties, and tasks outside of this description[, . . . including] sitting for more than 50% of their shifts at sitting posts, in office positions, and as drivers." Doc. No. 56, Pl.'s CSF ¶ 5; Doc. No. 55, Pl.'s Mem. in Opp'n, VanHorn Decl. ¶ 5; *see also* Doc. No. 49-37, VanHorn Dep. at 249:19-25 (stating that at specific posts guards would "be either sitting pretty much the whole time observing with hardly anyone around.  Or, [they'd] be sitting and then getting up and checking ID's as people . . . come through the gate"); *id.* at 257:3-9 ("[I]n my history of three years of employment there . . . not once at the sit down posts . . . was there ever consistent traffic where you had to stand the entire time.").  Plaintiff further stated that Defendant allowed guards to sit during their shifts.  *Id.* at 257:21-24 (confirming that Defendant allowed guards to "sit down between traffic coming at a given post"); *see also id.* at 250:7-10 (stating that neither Defendant nor Navy personnel ever told her that "it was inappropriate . . . to sit at any post").  Plaintiff specifically identified "Ford Island, Sierra gate, [and] the Bravo gates" as "sitting

posts." *Id.* at 250:12-14.

On December 3, 2009, Plaintiff was injured while discharging a shotgun during her annual requalification assessment.  Doc. No. 49, Def.'s CSF ¶ 15.  Plaintiff continued to work and alleges that she gave verbal notification of her injury to her supervisor, Captain McNeal ("McNeal"), on November 8, 2010.  Doc. No. 49-37, Def.'s Ex. 2, VanHorn Dep. at 221:5-222:4.  Plaintiff provided a written report of her injury on November 10, 2010.  Doc. No. 49, Def.'s CSF ¶ 15; Doc. No. 49-9, Def.'s Ex. H, Notification of Injury.  On November 17, 2010, Plaintiff provided a doctor's note confirming that she was being treated for shoulder and back pain.  Doc. No. 49-10, Def.'s Ex. I.  And on or about that date, Plaintiff "began asking her supervisor, . . . McNeal, to be able to sit on post and/or for special post assignments as an accommodation."  Doc. No. 49, Def.'s CSF ¶ 19.  Plaintiff alleges that McNeal denied these requests.  *Id.* ¶ 20.

Plaintiff further alleges that between November 8 and December 14, 2010, she told McNeal that she "was in pain," "was under a doctor's care," was "going to [begin] physical therapy [and would] be in a lot more pain than [she was in] already," that she was "told by [her] doctor that [she would] need to take it [as] easy as possible when [she was] working," and "asked for accommodations to be able to sit down."  Doc. No. 49-37, VanHorn Dep. at 224:19-20, 246:9-22.

5

Plaintiff also stated that at least on one day, she "had so much pain, I had to stand, it was just horrible, unbelievable, and I had asked more than once, please don't put me on this post, I'm having a lot of pain today.  You know, I would have been fine sitting, still in pain, but okay.  Standing was just really hard."  *Id.* at 251:19-25. Plaintiff alleges that "during the period from November 2010 to December 2010," she "was able to perform her job duties."  Doc. No. 55, VanHorn Decl. ¶ 15; *see* Doc. No. 49-37, VanHorn Dep. at 294:15-18 ("I could stand the entire time that I worked for [Defendant], and that would include . . . November through the end of December.").

Plaintiff further claims that McNeal refused to accept a note from Plaintiff's physical therapist, dated November 30, 2010.  Doc. No. 49, Def.'s CSF ¶ 21.  The note states that Plaintiff "is participating in physical therapy.  It is recommended that she be able to sit, preferably with her back supported, during her shift."  Doc. No. 49-11, Def.'s Ex. J.  On December 10, 2010, Plaintiff's doctor, Dr. Bruce S. Katsura, withheld certification for Plaintiff to participate in the annual requalification assessment "due to health concerns," but stated that she was "capable of [the] non-physical component of testing (written portion)."  Doc. 49-13, Def.'s Ex. L.

Defendant did not work after December 15, 2010.  From December 16, 2010 until October 22, 2011, Plaintiff was on medical leave.[2]

### 2.    *Racial Discrimination*

Plaintiff alleges that she "was subject[ed] to a series of harassing, demeaning, and inappropriate incidents . . . perpetrated by a number of non-white, local, Asian male security officers . . . because [she] was the only Caucasian female in [her] group of approximately twenty officers."  Doc. No. 55, VanHorn Decl. ¶ 19.  More specifically, one time during "2008 or 2009, unnamed co-workers allegedly made fun of Plaintiff about being from the mainland, and not being local."  Doc. No. 49, Def.'s CSF ¶ 6.  Plaintiff appears to contradict her admission of this one incident by also stating that because of an accommodation to protect her from skin cancer,[3] "other officers, during 2009 and 2010, would oftentimes refer to me as being from the mainland and not local, indirectly referring to me being

---

[2]  On December 16, 2010, Plaintiff was initially placed on administrative leave, pending a misconduct investigation.  Doc. No. 49, Def.'s CSF ¶ 30.  On May 13, 2011, Defendant changed Plaintiff's work status to a medical leave of absence, effective December 16, 2010.  Doc. No. 49-23, Def.'s Ex. R.  Plaintiff's leave was extended to October 22, 2011, upon her receipt of twelve weeks of leave pursuant to the Family and Medical Leave Act ("FMLA").  Doc. No. 49, Def.'s CSF ¶ 33; Doc. No. 49-30, Def.'s Ex. Y.

[3]  Plaintiff states that in 2009, she asked to "use an umbrella while standing posts to protect [her] lighter skin from skin cancer."  Doc. No. 55, VanHorn Decl. ¶ 21.  While she was denied that accommodation, the supporting documentation shows that prior to this request, she was granted leave "to wear a black long-sleeved shirt to protect her arms from the sun."  Doc. No. 55, Pl.'s Ex. B. at 2.

Caucasian."  Doc. No. 55, VanHorn Decl. ¶ 21.  In December of 2009, Dillon Lai

("Lai") a co-worker, allegedly "harassed Plaintiff while on duty by not cooperating

with her or acknowledging her, and by cutting in front of her in line."  *Id.* ¶ 7.  On

November 30, 2010, Brandon Swain ("Swain"), a co-worker, stated to Plaintiff that

she was "the whitest one."  *Id.* ¶ 24.  On December 14, 2010, and twice before,

Matthew Quon ("Quon"), a co-worker, "allegedly commented to Plaintiff . . . about

her white skin."  *Id.* ¶ 26.

A number of incidents involve Brandon Liu ("Liu"), Plaintiff's

immediate supervisor.  Plaintiff alleges that during 2010, she was "repeatedly

yelled at and demeaned by [Liu], a non-white, Asian male, in front of other

security officers."  Doc. No. 55, VanHorn Decl. ¶ 20.  On November 30, 2010, Liu

"yelled at Plaintiff" about a "payroll discrepancy," but Plaintiff admitted that "none

of [his] yelling concerned or mentioned race."  Doc. No. 49, Def.'s CSF

¶ 13.  Plaintiff alleges that Liu "often wrote false reports about her because of her

race, and that supporting testimony for those reports was also false and motivated

by her race."  *Id.* ¶ 8.  In February 2010, Plaintiff complained that Liu began

"correcting her on [weapon] downloading procedures" "now that [he is] a

sergeant" and because she is "female," "older," and "has a degree."  *Id.* ¶ 10.  On

December 11, 2010, Liu allegedly "pointed an unloaded weapon towards

[Plaintiff's] face for approximately three seconds." *Id.* ¶ 27.

Plaintiff alleges that Liu and Lai did not treat other non-white security officers in the same manner that they treated her.  Doc. No. 55, VanHorn Decl. ¶¶ 20, 22.  Plaintiff further alleges that the incidents involving Liu caused, and continue to cause, her to be "offended, alarmed, and traumatized."  *Id.* ¶ 20. Plaintiff alleges that all incidents supporting her hostile work environment claims "caused [her] severe emotional distress, pain, and suffering."  *Id.* ¶ 25.

## B.  Procedural Background

On June 8, 2010, Plaintiff dual-filed a Charge of Discrimination with the Hawaii Civil Rights Commission and the Equal Employment Opportunity Commission ("Charge"), alleging discrimination based on race and disability. Doc. No. 23, Def.'s Ex. B.  On April 23, 2012, after receiving a Dismissal and Notice of Rights, dated March 7, 2012, Plaintiff filed her Complaint alleging employment discrimination based on race or color, religion, sex, national origin, and disability.  Doc. No. 1.  On February 7, 2013, District Judge Leslie E. Kobayashi granted Defendant's Motion for Judgment on the Pleadings for failure to exhaust as to Plaintiff's discrimination claims based on national origin, sex, and religion, and denied the Motion as to Plaintiff's claims based on race and disability, including any potential race and disability claims based on her

employment termination.[4]  Doc. No. 39, Order Granting in Part and Denying in Part Defendant's Motion for Judgment on the Pleadings ("February 7 Order").  On May 10, 2013, this case was reassigned to District Judge Derrick K. Watson, and on September 9, 2013, Judge Watson recused himself and this case was reassigned to District Judge J. Michael Seabright.

On June 5, 2013, Defendant filed the instant Motion for Summary Judgment.  Doc. No. 48.  On August 24, 2013, Plaintiff filed a Memorandum in Opposition, Doc. No. 55, and Defendant filed a Reply on August 30, 2013.  Doc. No. 59.  A hearing was held on September 23, 2013.

## III.  STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

---

[4]  As Plaintiff's counsel confirmed at the hearing, she is not pursuing any claims based on her termination.

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56(a) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment). "'[C]onclusory, self-serving affidavit[s], lacking detailed facts and any supporting evidence,' are insufficient to create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)); *see also Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) ("As we have noted, '[c]onclusory affidavits that do not affirmatively show personal knowledge of specific facts are

insufficient.'") (quoting *Casey v. Lewis*, 4 F.3d 1516, 1527 (9th Cir. 1993)).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

## IV.  ANALYSIS

Defendant argues that Plaintiff failed to establish a prima facie case for both her race and disability claims and therefore summary judgment should be granted on all claims.  The court addresses each of Plaintiff's claims in turn.

### A.    Disability Discrimination/Failure to Accommodate Claims

Title I of the ADA, 42 U.S.C. § 12112(a), prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to . . . [the] terms, conditions, and privileges

of employment."  Pursuant to the ADA, the term "discriminate" includes "not

making reasonable accommodations to the known physical or mental limitations of

an otherwise qualified individual with a disability who is an applicant or employee,

unless [the employer] can demonstrate that the accommodation would impose an

undue hardship on the operation of the [employer's] business."  42 U.S.C. §

12112(b)(5)(A).

Similarly, HRS § 378-2(a)(1)(A) makes it an unlawful discriminatory

practice "for any employer to refuse to hire or employ or to bar or discharge from

employment, or otherwise to discriminate against any individual in compensation

or in the terms, conditions, or privileges of employment" because of a person's

disability.[5]

The court applies the familiar burden-shifting analysis derived from

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to claims of

discrimination on account of a disability.  *See, e.g.*, *Raytheon Co. v. Hernandez*,

540 U.S. 44, 49-50 (2003) (applying *McDonnell Douglas* burden shifting

---

[5]  "[B]ecause the definitions of disability in the ADA and HRS § 378-2 are substantially identical, the Hawaii Supreme Court has expressly adopted 'the [ADA] analysis for establishing a prima facie case of disability discrimination under HRS § 378-2,'" "and looks 'to the interpretations of analogous federal laws by the federal courts for guidance.'"  *Thorn v. BAE Sys. Haw. Shipyards, Inc.*, 586 F. Supp. 2d 1213, 1219 (citing *French v. Haw. Pizza Hut, Inc.*, 105 Haw. 462, 467, 99 P.3d 1046, 1050 (2004)).  Accordingly, the court sets forth a single framework for Plaintiff's claims pursuant to the ADA and HRS § 378-2.

framework to ADA disability discrimination claim); *Thorn v. BAE Sys. Haw. Shipyards, Inc.*, 586 F. Supp. 2d 1213, 1218-19 (D. Haw. 2008).[6]

Under this burden-shifting analysis, Plaintiff must first establish a prima facie disability discrimination claim. *See, e.g.*, *Raytheon*, 540 U.S. at 49 n.3. Plaintiff must put forth evidence that she: (1) is "disabled" within the meaning of the statute; (2) is a "qualified individual" (that is, she is able to perform the essential functions of her job, with or without reasonable accommodations); and (3) suffered an adverse employment action because of her disability -- *i.e.*, Defendant failed to reasonably accommodate her disability. *See, e.g.*, *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (citing 42 U.S.C. § 12112(a), (b)(5)(A) (requiring reasonable accommodation)).

"At the summary judgment stage, the 'requisite degree of proof necessary to establish a *prima facie* case . . . is minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

---

[6] As this court noted in *Thorn*, "[t]he *McDonnell Douglas* burden-shifting analysis does not apply where 'the employer acknowledges reliance on the disability in the employment decision.'" 586 F. Supp. 2d at 1219 n.4. "In such case, once the plaintiff establishes a prima facie case, 'the employer bears the burden of showing that the disability is relevant to the job's requirements.'" *Id.* (quoting *Snead v. Metro Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 n.10 (9th Cir. 2001)).

If Plaintiff establishes her prima facie case, the burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its employment action. *Raytheon*, 540 U.S. at 49 n.3. If Defendant proffers such a reason, "the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." *Id.* (citation omitted). The parties do not dispute that Defendant failed to provide a reasonable accommodation between early November and December 15, 2010. Thus, the court will address whether Plaintiff was a disabled and qualified individual.

### 1.    *Disability*

The ADA defines disability with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1).

Plaintiff argues that her "back and shoulder injur[ies] affected the major life activity of being able to stand for certain periods of time." Doc. No. 55, Pl.'s Opp'n Mem. at 12. Defendant does not dispute that Plaintiff's back and shoulder injuries constitute a physical impairment,[7] and that "standing" is a major

---

[7] A physical impairment includes "[a]ny physiological disorder or condition . . . affecting
(continued...)

life activity under the ADA.  Doc. No. 59, Def.'s Reply at 3.[8]  Rather, Defendant

argues that Plaintiff failed to provide evidence sufficient to defeat a summary

judgment motion that her back and shoulder injuries substantially limited her

ability to stand between early November and December 15, 2010.  *Id.*  The court

disagrees.

Although Defendant may have prevailed on this claim under an earlier

version of the ADA, in 2008 Congress adopted the ADA Amendments Act

("ADAAA"),"reinstating a broad scope of protection to be available under the

ADA," and expressly rejecting the more stringent standards set forth in *Sutton v.*

*United Air Lines*, 527 U.S. 471 (1999), and *Toyota Motor Manufacturing,*

*Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002).  Pub. L. No. 110-325, § 2(b), 122

Stat. 3553.  Thus, pre-ADAAA cases may "carry little, if any, precedential weight

with respect to the issue of [disability]."  *Feldman v. Law Enforcement Assocs.*

*Corp.*, 779 F. Supp. 2d 472, 483 n.3 (E.D.N.C. 2011); *see also* 29 C.F.R.

§ 1630.2(j)(1)(iv) ("[T]he term 'substantially limits' shall be interpreted and

applied to require a degree of functional limitation that is lower than the standard

for 'substantially limits' applied prior to the ADAAA").  The court thus addresses

---

[7](...continued)
one or more body systems, such as . . . musculoskeletal."  29 C.F.R. § 1630.2(h)(1).

[8] "[M]ajor life activities include . . . standing[.]"  42 U.S.C. § 12102(2)(A); *see* 29 C.F.R.
§ 1630.2(i)(1)(i).

the "substantially limits" test under the ADAAA.

An impairment "substantially limits" a major life activity when an individual is either unable to perform a major life activity or is "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to . . . the average person in the general population." 29 C.F.R. § 1630.2(j)(1). The term "substantially limits" is to be "construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i); *see also* 42 U.S.C. § 12102(4)(A)-(C). And an impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). Although courts are to make "an individualized assessment," 29 C.F.R. § 1630.2(j)(iv), the focus of the court's attention should be primarily on:

> whether [employers] have complied with their obligations and whether discrimination has occurred, not [on] whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

29 C.F.R. § 1630.2(j)(2)(iii).

At the summary judgment stage, the Ninth Circuit does not require comparative or medical evidence to establish a genuine issue of material fact

17

regarding the substantial limitation of a major life activity.  *See Head v. Glacier N.W. Inc.*, 413 F.3d 1053, 1058 (9th Cir. 2005).  "[A] plaintiff's testimony may suffice to establish a genuine issue of material fact," *id.*, provided it meets the generally required degree of personal knowledge and factual detail needed to withstand summary judgment.  *See Hexcel*, 681 F.3d at 1063.

Plaintiff's evidence that her back and shoulder injuries substantially limited her ability to stand between early November and December 15, 2010 includes (1) her deposition testimony that because of her back and shoulder injuries, she was in significant pain and that standing was "really hard," Doc. No. 49-37, VanHorn Dep. at 251:24-25; (2) Plaintiff's allegation that she asked "to be able to sit on post and/or for special post assignments," Doc. No. 49, Def.'s CSF ¶ 19; (3) a November 30, 2010 letter from her physical therapist indicating that she was "participating in physical therapy" and "recommend[ing] that she be able to sit, preferably with her back supported, during her shift," Doc. No. 49-11, Def.'s Ex. J; and (4) a December 10, 2010 notification from Plaintiff's doctor that Plaintiff was "not eligible to participate in" the annual requalification assessment "due to health concerns," but was "capable of [the] non-physical component of testing (written portion)."  Doc. 49-13, Def.'s Ex. L.

In opposition, Defendant points to Plaintiff's contradictory deposition testimony where she states that she could stand during her entire shift while working for Defendant, *see* Doc. No. 49-35, Def.'s Ex. 2, VanHorn Dep. at 251:16-252:21, 279:8-20, and 294:9-295:13.  Defendant's argument is not persuasive.

The EEOC guidelines provide that:

In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of disability, *the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve*.  For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population.

29 C.F.R. § 1630.2(j)(4)(iii) (emphasis added).  In this case, Plaintiff offered evidence that her injuries caused her to suffer greater pain while standing than most people in the community would experience.

A review of cases analyzing substantial limits under the newer ADAAA supports the court's conclusion.  In *Eastman v. Research Pharmaceuticals, Inc.*, 2013 WL 3949236 (E.D. Pa. Aug. 1, 2013), the plaintiff offered evidence that because of sporadic "back pain," she "had significant

19

difficulty moving, walking, sitting, and bending," even though she was also able to drive and "complete full work days." *Id.* at *9. The court found a genuine issue of fact as to disability:

> although plaintiff may have been able to drive and work, plaintiff put forth evidence from which a factfinder could reasonably conclude that these activities were more difficult for her as compared to most people in the general population because they caused her significant pain. Accordingly, under the less restrictive standard of the ADAAA, I conclude that Eastman has offered sufficient evidence to raise a genuine issue of fact as to whether she was disabled.

*Id.* at *10. Similarly, in *Estate of Murray v. UHS of Fairmount, Inc.*, 2011 WL 5449364, at *7-8 (E.D. Pa. Nov. 10, 2011), the court found a genuine issue of material fact on the issue of disability even though the sole evidence of substantial limitation was the plaintiff's testimony that because of her depression, she experienced symptoms such as "[n]ot eating, not sleeping, having racing thoughts . . . [and] just feeling hopeless, helpless, sad." *Id.* at *7. *See also Merritt v. Harrah's Entm't, Inc.*, 2012 WL 3061490, at *6 (D. Nev. July 26, 2012) (finding plaintiff's inability to stand or walk for long periods of time, ongoing foot problems, and absence from work for substantial periods of time during her recovery sufficient to constitute a disability pursuant to the ADAAA); *Fleck v. Wilmac Corp.*, 2011 WL 1899198, at *4-5 (E.D. Pa. May 19, 2011) (finding

allegations of an ankle injury that prevented the plaintiff from standing for more than one hour or walking more than a half-mile, even though she could work with the use of a cam boot, sufficient to establish disability under the ADAAA and withstand a motion to dismiss).

Plaintiff provided evidence that between early November and December 15, 2010, her injuries caused significant pain while standing, she was receiving treatment, she asked to be allowed to sit and/or for less arduous posts, and that her medical providers recommended that she sit and/or "take it easy" at work.  Doc. No. 49-37, VanHorn Dep. at 246:21.

Viewing this evidence in a light most favorable to Plaintiff, and construing such evidence broadly in favor of expansive coverage as required by the ADAAA, the court finds that a reasonable jury could find that Plaintiff's back and shoulder injuries substantially limited her ability to stand.  In short, summary judgment is inappropriate as to whether Plaintiff was disabled within the meaning of the ADA.

### 2.   *Qualified Individual*

"The ADA defines a 'qualified individual' as an individual 'with a disability who, *with or without reasonable accommodation*, can perform the essential functions of the employment position that such individual holds or

desires.'"  *Dark v. Curry Cnty.*, 451 F.3d 1078, 1086 (9th Cir. 2006) (quoting 42

U.S.C. § 12111(8)) (emphasis in original).  "Essential functions" of a job are the

"fundamental job duties of the employment position . . . not includ[ing] the

marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  Although Plaintiff

bears the burden of establishing her prima facie case, Defendant "has the burden of

production in establishing what job functions are essential[.]"  *Samper*, 675 F.3d at

1237.

      a.     *Essential function*

        The ADA provides that "consideration shall be given to the

employer's judgment as to what functions of the job are essential, and if an

employer has prepared a written description before advertising or interviewing

applicants for the job, this description shall be considered evidence of the essential

functions of the job."  42 U.S.C. § 12111(8).  "Such evidence, however, is not

conclusive[.]"  *Rohr v. Salt River Project Agri. Improvement & Power Dist.*, 555

F.3d 850, 864 (9th Cir. 2009); *see also* 29 C.F.R. § 1630.2(n)(3) (itemizing

additional factors to consider including the amount of time spent performing the

function, consequences of not requiring the employee to perform the function, and

work experience of current and past employees in that or similar jobs).

Defendant provides the following evidence:  (1) the Armed Security Officer Job Description, which described "the job duties, job requirements, physical requirements, and working conditions" for this position, specifically stating that the job required regular (75-100%) standing/walking/running, and rarely (25%) sitting, Doc. No. 49-2, Def.'s Ex. A; and (2) Rawlins' Declaration that essential functions of the armed security officer job included:

> performing identification checks and vehicle inspections; meeting physical fitness and weapons qualifications set by the Navy; being properly outfitted with the required duty belt and its equipment and weaponry; rotating among posts in accordance with the Navy's and [Defendant's] needs; and to remain standing at post armed, equipped, and prepared to deal with emergency situations and potential threats to base security.

Doc. No. 49, Def.'s CSF ¶ 5; Doc. No. 49-1, Rawlins Decl. ¶¶ 6, 9-11, 17-18, 20-23.

In opposition, Plaintiff claims that: (1) she personally "observed various armed security officers . . . sitting for more than 50% of their shifts at sitting posts, in office positions, and as drivers,"  Doc. No. 56, Pl.'s CSF ¶ 5; Doc. No. 55, VanHorn Decl. ¶ 5; (2) at specific posts, guards would "be either sitting pretty much the whole time observing with hardly anyone around.  Or, [they'd] be sitting and then getting up and checking ID's as people . . . come through the gate," Doc. No. 49-37, VanHorn Dep. at 249:19-25; (3) "[I]n my history of three years of

23

employment there . . . not once at the sit down posts . . . was there ever consistent traffic where you had to stand the entire time," *id.* at 257:3-9; (4) Defendant allowed guards to "sit down between traffic coming at a given post," *id.* at 257:21-24; (5) neither Defendant nor Navy personnel ever told her that "it was inappropriate . . . to sit at any post," *id.* at 250:7-10; and (6) "Ford Island, Sierra gate, [and] the Bravo gates" are "sitting posts." *Id.* at 250:12-14.

Plaintiff's evidence is sufficient to raise a triable issue of fact as to whether standing and rarely sitting is an essential function of the armed security guard position. *See Taylor v. Rice*, 451 F.3d 898, 907 (D.C. Cir. 2006) ("[I]ssues of fact regarding job's essential functions precluded summary judgment for employer because record showed that, in practice, employer did not require all other employees to abide by claimed essential function."); *see also Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003) ("The question of whether a job requirement is a necessary requisite to employment initially focuses on whether an employer actually requires all employees in the particular position to satisfy the alleged job-related requirement.").

///

///

24

   b. *Interactive process to identify reasonable accommodation*

   Plaintiff contends that she was a qualified individual because she could perform the essential functions of her position with reasonable accommodation.  Defendant's argument to the contrary cannot withstand its failure to engage in a good faith interactive process.

   "Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations."  *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) (citing *Barnett v. U.S. Air*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *vacated on other grounds*, 535 U.S. 391 (2002)); *see also* 29 C.F.R. § 1603.2(o)(3) (explaining that the interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations").

   Defendant's duty to engage in the interactive process includes not only a discussion of Plaintiff's requested accommodation, but also a continuing discussion to explore available alternatives when the requested accommodation is ineffective or too burdensome.  *See Zikcovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (citing *Barnett*, 228 F.3d at 1115); *see also Humphrey*, 239

F.3d at 1138; *Gidge v. Yakima Cnty.*, 2010 WL 4641711, at *8 (E.D. Wash. Nov.

8, 2010) ("The burden of identifying a potentially reasonable accommodation is

not placed solely on the employee; rather, the interactive process is the means by

which it is determined whether a reasonable accommodation exists.") (citing

*Barnett*, 228 F.3d at 1113).

    An employer who fails in good faith to engage in an interactive

process is liable under the ADA "if a reasonable accommodation without undue

hardship to the employer would otherwise have been possible." *Humphrey*, 239

F.3d at 1139.  And, an employer who fails to engage in an interactive process in

good faith is not entitled to summary judgment unless "a reasonable finder of fact

*must* conclude that 'there would in any event have been no reasonable

accommodation available.'" *Dark*, 451 F.3d at 1088 (quoting *Morton v. United

Parcel Serv., Inc.*, 272 F.3d 1249, 1256 (9th Cir. 2001), *overruled on other

grounds by Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007)).

    On November 17, 2010, Plaintiff provided a doctor's note confirming

her treatment for shoulder and back pain.  Doc. No. 49-10, Def.'s Ex. I.  The

parties agree that on or about that date, Plaintiff began asking McNeal "to be able

to sit on post and/or for special post assignments as an accommodation."  Doc. No.

49, Def.'s CSF ¶ 19; *see also* Doc. No. 49-37, VanHorn Decl. at 224:6-7.  Thus,

viewing this evidence in a light most favorable to Plaintiff, Defendant's duty to engage in a good faith interactive process was triggered no later than November 17, 2010. And the record is also clear that Defendant never engaged in any interactive process. Thus, absent a finding that no reasonable accommodation was possible, Defendant is not entitled to summary judgment. *See Dark*, 451 F.3d at 1088. No such evidence was presented. As explained above, Plaintiff provided evidence that sitting posts were available. The record, viewed in a light most favorable to Plaintiff, establishes that an accommodation was reasonable and available. *See id.* (determining that a summary judgment is not available to an employer where a reasonable juror could find that an accommodation was reasonable and available).

     c.    *Delay in providing accommodation*

Alternatively, Defendant argues that because Plaintiff was granted medical leave on December 16, 2010, a one month delay in the provision of a reasonable accommodation is not sufficient to impose liability for failure to engage in the interactive process. The court disagrees.

The cases Defendant cites involve a delay in the provision of a reasonable accommodation after the employer and employee had engaged in an interactive process and/or where there was no evidence that the employer was

responsible for the delay or breakdown in an interactive process.[9]  These cases did not excuse a complete failure to engage in the interactive process.

Because there are genuine issues of fact as to whether Plaintiff was a qualified individual, Defendant is not entitled to summary judgment on Plaintiff's ADA and HRS § 378-2 disability discrimination claims.

## B.   Racial Discrimination/Hostile Work Environment Claims

### 1.   *Legal Framework*

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against "any individual" based on that individual's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Discrimination under Title VII "encompasses the creation of a hostile work environment."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (Title VII guarantees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult").  "Courts have long recognized that a workplace in which racial hostility is

---

[9]  *See, e.g., West v. N.M. Taxation & Revenue Dep't.*, 757 F. Supp. 2d 1065, 1122-26 (D.N.M. 2010) (finding a 3 month delay in providing agreed upon accommodation did not constitute adverse employment action to satisfy necessary element of retaliation claim); *Krocka v. Riegler*, 958 F. Supp. 1333, 1342 (N.D. Ill. 1997) (declining to dismiss a claim that an 8 month delay in providing accommodation constituted a failure to reasonably accommodate); *Powers v. Polygram Holding, Inc.*, 40 F. Supp. 2d 195, 202-203 (S.D.N.Y. 1999) (concerning delay in providing reasonable accommodation).  The only case cited by Defendant that addresses a delay in the interactive process is also distinguishable.  In *Linder v. Potter*, 2009 WL 2595552, at *8 (E.D. Wash. Aug. 18, 2009), the court denied summary judgment because there was a factual dispute regarding when the duty to engage in the interactive process was triggered.  Here, no such dispute exists.

pervasive constitutes a form of discrimination." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004) (quoting *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1200 (9th Cir. 1991)).

Similarly, HRS § 378-2(a)(1)(A) makes it an unlawful discriminatory practice "for any employer to . . . discriminate against any individual in compensation or in the terms, conditions, or privileges of employment" because of a person's race.  Hawaii courts analyzing a claim of discrimination under HRS Chapter 378 look to federal courts' interpretations of Title VII for guidance. *See Arquero v. Hilton Hawaiian Vill. LLC*, 104 Haw. 423, 429-30, 91 P.3d 505, 511-12 (2004) ("In interpreting HRS § 378-2, we have held that federal courts' interpretations of Title VII . . . are persuasive[.]"); *see also Shoppe v. Gucci Am., Inc.*, 94 Haw. 368, 377, 14 P.3d 1049, 1058 (2000) ("In interpreting HRS § 378-2 in the context of race . . . discrimination, we have previously looked to the interpretations of analogous federal laws by the federal courts for guidance.").

The same *McDonnell Douglas* burden-shifting scheme set forth above applies to an analysis of Plaintiff's race discrimination claims. *See Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003) (applying *McDonnell Douglas* test to Title VII claims); *Furukawa v. Honolulu Zoological Soc.*, 85 Haw. 7, 13, 936 P.2d 643, 649 (1997) (applying *McDonnell Douglas* framework to HRS

§ 378-2 race and gender discrimination claims).

To establish her prima facie case of a hostile work environment under Title VII, Plaintiff must show that: (1) she was subjected to verbal or physical conduct of a racial nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter her conditions of employment and create an abusive work environment.  *Vasquez*, 349 F.3d at 642; *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005).  In considering whether the discriminatory conduct was "severe or pervasive," the court looks to "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).  The Supreme Court has cautioned that "Title VII [is] not . . . a general civility code," and therefore, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (citations and quotations omitted).

30

The court must consider the totality of the circumstances, including whether the harassment was both objectively and subjectively abusive. *Freitag v. Ayers*, 468 F.3d 528, 539 (9th Cir. 2006). "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *McGinest*, 360 F.3d at 1113 (citation and quotation signals omitted). While "[i]t is enough if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay in her position," to "[s]imply caus[e] an employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII." *Id.*

Further, where the alleged harasser is a co-worker rather than a supervisor, a plaintiff must show that "the employer knew or should have known of the harassment but did not take adequate steps to address it." *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001).

### 2. *Application*

#### a. *Liu's conduct*

Plaintiff alleges that her supervisor, Liu, "repeatedly yelled at and demeaned" her, Doc. No. 55, VanHorn Decl. ¶ 20, "often wrote false reports about her," Doc. No. 49, Def.'s CSF ¶ 8, "corrected her on [weapon] downloading procedures," *id.* ¶ 10, and "pointed an unloaded weapon towards [her] face for

approximately three seconds." *Id.* ¶ 27.

Plaintiff, however, does not allege any facts linking Liu's conduct to race-based animus.  At best, Plaintiff offers only her conclusory allegations that Liu's conduct toward her was "because [she] was the only Caucasian female in [her] group of approximately twenty officers," Doc. No. 55, VanHorn Decl. ¶ 19, or "because of her race."  Doc. No. 49, Def.'s CSF ¶ 8.  These bare, conclusory allegations are insufficient to establish that Liu's conduct was in fact based on Plaintiff's race.  *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (holding that "conclusory statements of bias do not carry the nonmoving party's burden in opposition to a motion for summary judgment"); *Lucas v. Chic. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) (holding "that conclusory statements [regarding similarly situated employees], not grounded in specific facts, are not sufficient to avoid summary judgment"); *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact."); *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988) ("[P]urely conclusory allegations of alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment.").

b. *Conduct of co-employees*

Furthermore, Plaintiff identifies only sporadic and/or unquantified incidents over a three year period of alleged racial harassment by other security guards:  (1) one isolated comment by Swain that Plaintiff was "the whitest one," Doc. No. 49, Def.'s CSF ¶ 7; (2) three comments by Quon vaguely referencing "her white skin," *id.* ¶ 26; (3) one time unnamed co-workers allegedly made fun of her about being from the mainland and not being local, Doc. No. 49, Def.'s CSF ¶ 6; and (4) "oftentimes" unnamed co-workers would "refer to [her] as being from the mainland and not local."  Doc. No. 55, VanHorn Decl. ¶ 21.

Even if the court were to assume that references to Plaintiff being from the mainland are racial in nature (which is an untenable stretch), these allegations are neither severe nor pervasive enough to alter the conditions of Plaintiff's employment.  *Compare Vasquez*, 307 F.3d at 893 (finding no hostile work environment where employee was told that he had "a typical Hispanic macho attitude," that he should work in the field because "Hispanics do good in the field" and where he was yelled at in front of others), *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1031, 1036 (9th Cir. 1990) (determining no hostile work environment where employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, and

33

kept illegal personnel files on Latino employees), *and Kortan*, 217 F.3d at 1111 (determining no hostile work environment where the supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of the plaintiff on several occasions and directly called the plaintiff "Medea"), *with Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 870 (9th Cir. 2001) (finding hostile work environment where male employee of restaurant was subjected to a relentless campaign of insults, name-calling, vulgarities, and taunts of "faggot" and "fucking female whore" by male co-workers and supervisors at least once a week and often several times a day), *and Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998) (finding hostile work environment where plaintiff's supervisor made repeated sexual remarks about the plaintiff over a two-year period, calling her "gorgeous" and "beautiful" rather than her name, telling her about his sexual fantasies and his desire to have sex with her, commenting on her "ass," and asking over a loudspeaker if she needed help changing clothes).

There simply is no evidence that Plaintiff was subjected to any severe or pervasive conduct of a racial nature.  Plaintiff has failed to establish her prima facie case for a Title VII racial hostile work environment claim.  Defendant is entitled to summary judgment as to the discrimination claims based on race.

# V.  **CONCLUSION**

Based on the foregoing, Defendant's Motion for Summary Judgment

is GRANTED as to the Title VII and HRS § 378-2 racial discrimination claims and

DENIED as to the ADA and HRS § 378-2 disability discrimination claims.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 18, 2013.



　　/s/ J. Michael Seabright　　　
J. Michael Seabright
United States District Judge

*VanHorn v. The Hana Group, Inc.*, Civil No. 12-00215 JMS-KSC, Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment